### HABER et al. v. BOND STORES, Inc.

No. 10829.

United States Court of Appeals
Sixth Circuit

Dec. 2, 1949.

Albert D. Cash, Cincinnati, Ohio (Albert D. Cash, John R. Hahn, of Dolle, O'Donnell & Cash, Cincinnati, Ohio, Morris Berick, Cleveland, Ohio, on the brief), for appellants.

Robert S. Marx, Cincinnati, Ohio (Robert S. Marx, Frank E. Wood, Jr., John J. Luhrman, John Wood II, of Nichols, Wood, Marx & Ginter, Cincinnati, Ohio, Monroe L. Friedman, of Mass & Davidson, New York City, on the brief), for appellee.

Before ALLEN, McALLISTER, and MILLER, Circuit Judges.

## McALLISTER, Circuit Judge.

Appellant real estate agents brought suit against Bond Stores to collect compensation for services rendered in a real estate transaction. The case was tried before a jury, which returned a verdict for defendant. Appellants filed a motion for a new trial, which was denied, and they appeal.

Appellants claim that they were employed by appellee company on December 3, 1943, to find a location in Cincinnati for a store to replace the one which appellee at that time occupied, as well as to survey and check all possible locations which might be available in Cincinnati. They contend that after considerable work, they found various locations suitable for appellee, including the southwest corner of Sixth and Vine Streets, called the Emery site, and the northeast corner of Fifth and Vine Streets, called the Mabley and Carew site, and advised the Bond Stores of these locations; that while waiting for Bond Stores to inspect the sites, the latter deliberately refrained from an examination thereof, wrongfully terminated appellants' authority, and proceeded to handle the transaction through someone else; that the Bond Stores then negotiated for the same corners above mentioned and entered into arrangements for the leasing of both places; that they afterward rejected one of the locations and concluded a deal for the Emery site at the southwest corner of Sixth and Vine Streets for a term of twenty years, based upon a guaranteed minimum rental of $75,000 per year, plus a certain percentage of sales. Appellants claim that the customary real estate commission at the time on this transaction was $46,500, plus a percentage of sales, and that the reasonable value of their services was the same as the customary real estate commission on this deal.

It is the contention of Bond Stores that they did not enter into any contract with appellants in which they agreed to pay them for their services, but that the understanding was that they would pay a commission only if the appellants presented the right kind of site, and. the kind of a proposition which they would accept, and that appellants never fulfilled these requirements.

For an understanding of the issues in the case, an outline of the relations between the parties may be helpful. Appellants had a general method they followed with chain stores. They submitted by letter proposed locations all over the country, stating that they had investigated the sites in question, that the locations were the best for the chain in question, and that they desired to have the executives of the chain come and investigate them. They commenced this method with Bond Stores in 1935, submitting various locations. They wrote appellee company a great number of letters about store sites in more than a score of cities in different states. In many instances, these letters were accompanied by a street plat of the city involved, with various locations indicated in red crayon. In one of these letters, dated December 16, 1937, appellant David Haber wrote to Bond Stores that appellants had been advised that Bond had given another real estate agent authority to represent it with regard to a store location in Richmond, Virginia, and that the result was most embarrassing to appellants because of the fact .that they had already secured the information on the properties in Richmond which the other agent had offered, and that appellants had so advised Bond. Haber went on to say that he and his brother were "shocked;" and that he. had just written a letter about a situation in Memphis concerning which he would appreciate Bond's "clearing up."

He stated that he had spent considerable time and had gone to a great deal of expense during prior months, after the matter of store locations had first been discussed with Bond; that his brother had also discussed the same matter with appellee company the previous week. He requested that Bond write him promptly, and emphasized that he hoped appellants would "receive the proper cooperation and encouragement covering the towns and cites in which we have already procured data to meet with your requirements;" that they had already "corralled" information on ten southern cities, which he named, and that he and his brother were proud of their business record for fair and square dealing and had held the Bond Company in high esteem, which they had evidenced by making a very substantial investment in its stock. He continued: "As I have advised on many, many occasions, I stand ready and willing to meet with you, at your convenience, in order to make an inspection of the locations upon which we have information in the various cities already brought to your attention. It was your wish and desire that I *not* send complete information until you advised me that you would take a trip to make these various inspections. All of the data, which I now hold, can be compiled and I therefore await your further advices and instructions."

The foregoing letter seemed to indicate that Bond had been under an agreement or an obligation to negotiate its real estate deals through the Habers. But Bond had not asked for any of these submissions by the Habers, and promptly let the latter know that the Habers' assumptions that they were Bond's representative were entirely unjustified, and that Bond was not bound to appellants in any way. In order to avoid any misunderstanding, Bond, therefore, on the same day on which it received David Haber's letter, December 17, 1937, replied, as follows: "If you have corralled any information, you have done so on your own, as a matter of good business, for I wrote you that you were doing it of your own volition and that we would avail ourselves of this information if we wanted to, but up to date we have not."

Sometime in 1941, during a routine call on Bond's in New York, David Haber learned that the company would need a new location in Cincinnati. Two years later, in January or April, 1943, Haber again called on Bond's, showing them a map of different locations in Cincinnati. From certain statements made by Bond officials during this call, which appellants say were repeated in numerous other interviews, as well as various negotiations resulting therefrom, appellants based their claim for remuneration.

Appellants' claim as to what constituted the agreement, as set forth in the pleadings and appellants' brief, is susceptible of some confusion. In their petition, appellants set forth that they were employed by Bond "to represent it in Cincinnati to deal with prospective lessors for the purpose of obtaining for defendant a new location in Cincinnati * * * and also to survey and check all possible locations which might be made available for defendant in Cincinnati; and *defendant knew that plaintiffs were in this business and expected to be paid for their services.*" They further set forth that they had "found" the two corner locations heretofore mentioned, about which Bond was fully advised, but that Bond itself negotiated the deal for the Emery location. Appellants then set forth that the *reasonable value of their services* was the same as the customary real estate commission for a deal of this type, and asked judgment for such amount. This is clearly a claim of quantum meruit on implied contract to pay for the services rendered. In their brief filed in this court by appellants' counsel, there seems some uncertainty as to the nature of the claim. It is set forth in the brief that "The plaintiffs (appellants) asserted that they were employed by the defendant (Bond) to find a location for it in Cincinnati and defendant *expressly* and *impliedly promised* to pay for the services which were rendered." However, as above mentioned, nothing in appellants' petition, filed as commencement of suit, justified the claim that it was based upon express contract.

From the above statement in the brief of counsel, it would appear that appellants are now basing their claim on both express and implied contract. Moreover, it appears from the testimony of appellant David Haber, when he first appeared as a witness for the taking of his deposition preliminary to the trial, that he was asked whether he had ever been authorized in writing to represent Bond Stores in obtaining a location, to which he answered "No." He further testified that he inferred that he had the authority to represent Bond from his correspondence with them; and, further, that such authority was "all by inference with respect to activities." While these statements are not clear as to meaning, they probably could be interpreted to mean that appellant was attempting to show that he was employed by Bond under an implied contract.

The controlling consideration in this case is whether the agreement between the parties was an express contract or an implied contract; and that if it were an express contract, what constituted its terms.

 As indicated above, counsel for appellants rely on both an express and an implied contract. In this regard, it is the law that where there is an express contract, none can be implied; and a suit in quantum meruit on an implied contract for services rendered can not be supported by proof of an express contract to pay for the services. Creighton v. City of Toledo, 18 Ohio St. 447; Cale v. Kiner, Ohio App., 63 N. E.2d 839; Williams v. Goodyear, 84 Ohio App. 113, 85 N.E.2d 601. See Pullen v. Baltzer, 243 Mass. 419, 137 N.E. 926. If, therefore, there was an express contract between the parties to this case, there could be no implied contract, and there could be no quantum meruit recovery. It is necessary, then, to ascertain from the proofs what the nature of the agreement was.

What appellants claim as to the terms of the contract is found in the testimony of defendant David Haber, and because it determines our decision in this case, we refer to it in some detail. With respect to the agreement, Haber testified that as early as 1941, he discussed the expansion plans of Bond Stores with an official of that company who said "that some day in the near future they would have to look around for a desirable store lay-out in Cincinnati; he said keep your eyes open, don't work too hard, but we are going to be ready, and I said, I would like to handle it when you are ready.

"Q. What did he say? A. I wouldn't want anybody better than you to handle it; * * *

"Q. Was anything said about commission at that time? A. At that conference, no sir."

Haber then testified that he had another conference with Bond Stores in January or April of 1943, and in reply to a question as to what conversation took place at that time, he stated: "At that conference a map of Cincinnati was laid out on Mr. Friedman's desk. I showed what in my opinion would be the logical locations * * * He (said) * * * well, suppose you go ahead and get busy now, we are about ready, our lease expires in a little over three years time,—it is not too soon to get busy. I said, have you given me authorization to go ahead? He said you have got authorization to go ahead, and from that time on, I started out scouring the town.

"Q. Was anything said about commission? A. Never worry about paying commission with Bonds,—you deliver us the right deal and we will pay you."

On cross-examination, he was asked:

"Q. What deal did Bond promise to pay you a commission on in 1941? A. Mr. Friedman disclosed the whole circumstances,—bring us good deals, don't worry about commission, we will take care of you.

"Q. Did he say that in 1941? A. Yes sir.

"Q. I thought you said here yesterday that he said that in 1943? A. He did say that in 1943.

* * * * * *

"Q. Your testimony yesterday was that they said keep your eyes open but nothing was said at the time about commissions? * * * I would like to give you the op-

portunity at this time to change your evidence in any particular that you want to change it? A. As the questions come out, as they are presented to me, if they require changing, I will change them.

"Q. Change them to meet the circumstances? A. Change them to meet the truth.

"Q. Weren't you giving us the truth yesterday? A. Yes sir.

"Q. Well now, what is the truth as you now conceive it as to what Mr. Friedman said? * * * talking of 1941, in March or April? A. In March or April, Mr. Friedman said then we never had to worry about commissions, just give them good locations,—they wanted good locations.

\* · \* \* \* \* \*

"Q. Now, in 1941, you spoke of that again about commissions? A. I just got through saying it; I will be glad to repeat it, that *he said, you don't have to worry about commissions; if the locations are right and the propositions are right, if we take them, you will get paid by our Bond stores.*

"Q. I want to ask you if this is not the first time that you have ever said that anybody has said to you that Bond stores would pay you a commission? A. No; I don't think this is the first time.

"Q. Yesterday, even, in the 1943 meetings, all that you purported to quote anybody as saying is, don't worry about commissions, wasn't it? A. Yes sir.

"Q. You never up to this second have quoted anybody as having said to you Bond will pay you commissions, have you? A. No, I don't think I have, but I amplified it this morning.

"Q. How does it come that you suddenly this morning for the first time in your life have created that story? A. I didn't create that; *that was a promise all the time.*"

It required a persistent and artful cross-examination to elicit these statements from appellant David Haber and to bring him to committing himself in such detail as to the terms of the agreement.

■ From the foregoing, it is clear that according to Haber's own testimony, there was an express contract between the parties; that according to the terms of this contract, it was agreed that Bond Stores would pay the Habers commissions on any deals securing sites for them where the locations were right, the propositions were right, and where the Habers delivered the "right deals," if Bond Stores took them. Appellants did not deliver to Bond any deal where the proposition was right, or which Bond accepted. This testimony of appellant Haber removed from the case all right to recover on implied contract in quantum meruit for the value of the services rendered, and disposes of all contentions of appellants that they were entitled to be remunerated for their efforts in finding a site, even though unsuccessful.

With regard to recovery on the contract as testified to, appellant David Haber admitted that he knew that Bond would be interested in Cincinnati only in a building either to be built or remodeled by the owner for it, and appellants never presented Bond with a proposition from any owner who was willing to build or remodel for Bond. From 1941 up to July 18, 1944, the date on which Bond itself made the deal for the Emery location, appellants presented no proposition to Bond which they were authorized to present by the owner of any building. As to the location at the corner of Sixth and Vine Streets, Bond dealt directly with the Emery Estate for this site, and in the deal that was finally concluded, the Emery Estate entered into an agreement to build a large, modern store building on that location for Bond. Appellants had nothing to do with the delivery of this deal to Bond. They had presented no proposition on a site that was "right," and had presented nothing that Bond accepted. Under the terms of their contract with Bond, as testified to by Haber, appellants were not entitled to a commission or remuneration for services.

■ The trial court, in giving every consideration to appellants, allowed the case to go to the jury. Under the proofs, however, appellee company was entitled to a directed verdict on its motion made at the

conclusion of the proofs, and, accordingly, it becomes unnecessary to consider appellants' claims as to errors in the trial court's charge and special instructions to the jury. Contentions argued in the briefs as to the claimed fraud of appellee company in wrongfully terminating appellants' employment and double-dealing in its relation with appellants, and which might be pertinent if a claim in quantum meruit were before us, or if the terms of the express contract were different, are unnecessary to consider in view of the fact that under the contract as proved by appellants, Bond was not obligated to do more than pay a commission if the right site and the right proposition were submitted to it by appellants, if Bond accepted it. Bond was, therefore, the judge of the site and of any proposition submitted. No proposition having been submitted by appellants, or accepted by Bond, no liability arose under the contract as a result of Bond's closing the deal themselves directly with the owner of the Emery location.

Other contentions advanced by the parties are unnecessary to pass upon in view of our determination of the case.

The judgment of the district court is affirmed.